**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **OXYSURE SYSTEMS, INC.,** § § § *Plaintiff*, § § vs. § § **CHRISTOPHER F. CASTALDO,** § **JERRY CASTALDO, AND WALL** § **STREET BUY SELL HOLD, INC.,** § § *Defendants,* § § § § § § | Civil Action No. 4:15-cv-00324-ALM |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I.

**PRELIMINARY STATEMENT**

The Defendants in this case are life-long scam artists. What is ostensibly a consulting firm catering to public companies seeking to develop investor awareness is in reality the predatory alter ego of Chris Castaldo, a fast-talking grifter and former right-hand-man to the notorious Wolf of Wall Street, Jordan Belfort.

After being excommunicated from all legitimate corners of the securities industry for perpetuating numerous pump-and-dump schemes that defrauded investors in the 80s and 90s, Castaldo turned his attention to swindling microcap companies like Plaintiff, pitching his ability to improve their stock performance as a consultant. Once his clients realize the firm is actually not performing *any* services at all, he threatens them with litigation to extort additional payments or settlements.

II.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Oxysure Systems, Inc. ("Oxysure") is a medical device company based in Frisco, Texas. Using innovative technology, Oxysure products create pure, medical-grade oxygen when two dry and inert powders are mixed via a patented actuation mechanism. Oxysure devices are placed in hospitals, schools, churches, businesses, and government buildings for use in emergency situations. Oxysure is publicly traded over the counter under the symbol "OXYS."[1]

During two discrete periods spanning 2012 and 2013, Oxysure engaged the services of Wall Street Buy Sell Hold, Inc. ("WSBSH"), ostensibly a "public relations" firm based

---

[1] Declaration of Julian Ross, February 15, 2016, at ¶ 2.

in Long Island, New York. Oxysure and WSBSH executed two contracts, which were prepared by WSBSH.[2]

WSBSH came to Plaintiff's attention following solicitations pitching the firm's ability to help microcap companies increase investor awareness and raising share prices.[3] Christopher F. Castaldo ("Castaldo")—WSBSH's CEO and principal—was primarily responsible for soliciting Oxysure to retain his consulting services. Collectively, WSBSH and Castaldo are identified as "Defendants."[4]

Undisclosed in all of his pitches was Castaldo's extensive history of criminal and civil securities fraud.[5] For nearly a decade, Castaldo held leadership roles at the notorious boiler room Stratton Oakmont alongside the firm's founder Jordan Belfort—the now infamous "Wolf of Wall Street." There, Castaldo and his cronies got rich by orchestrating numerous pump-and-dump schemes that defrauded thousands of unwitting investors.

But Castaldo never told Oxysure that. Although Belfort went to prison and Stratton Oakmont collapsed, Castaldo continued perpetuating fraudulent pump-and-dumps at other boiler rooms like Foster Jeffries Co. and Duke & Co. As a result, he was eventually stripped of all securities registrations and licensures he once held, and forced to embark on his current line of work.[6] Before rebranding himself as WSBSH, Castaldo practiced the same business model with his first "consulting" firm, Corporate Communications Corp., which

---

[2] *See* Castaldo Tr. at Exh. 2 and 3 (the two consulting agreements).

[3] *See* Castaldo Tr. at Exhibit 7.

[4] Chris Castaldo's brother, Jerry Castaldo, is also a defendant in this case. However, we only seek Judgment in this case against Chris Castaldo and Wall Street Buy Sell Hold.

[5] *See* Castaldo Tr. at 108:1 to 108:18 and Exhibit 7 thereto.

[6] *See* Ross Decl. at ¶ 5. *See also SEC v. Castaldo, et al.*, No. 1:08-cv-08397-JSR (Complaint) (S.D.N.Y. 2008), available at 2008 WL 5367874.

the SEC sued in 2008 (along with Castaldo) alleging many of the same securities violations covered in Plaintiff's Complaint.[7]

Oxysure was unaware of Castaldo's shady past when it retained his firm. Castaldo and WSBSH did not do the things they promised: They did not put together a Marketing Plan;[8] and they did not provide the updates as required under the agreement.[9] While Castaldo may claim he forwarded Oxysure's press releases—he cannot even prove that he even did that.[10] In fact, they did almost no work at all and Oxysure had to hire other firms to perform the tasks being ignored by Defendants.[11]

Oxysure confronted Defendants with the fact they were not doing the work promised. Oxysure asserted that Defendants' conduct invalidated the consulting agreements and demanded return of the large initial and early-stage payments of cash and stock it had already made.[12]

Defendants refused to return their ill-gotten remunerations and demanded that Oxysure continue making payments. When Oxysure ceased making payments, Defendants discarded all pretenses of doing even minimal consulting work on Oxysure's behalf. In late 2013, WSBSH sued Oxysure in New York state court for breach of contract, seeking all

---

[7] *See SEC v. Castaldo, et al.*, No. 1:08-cv-08397-JSR Doc. #1 (Complaint) (S.D.N.Y. 2008), available at 2008 WL 5367874.

[8] *See* Castaldo Tr. at Exh. 2 and 3 (contracts at § 1, respectively), and at 90:25 to 91:14, 92:7 to 92:19; see also Ross Decl. at ¶ 4.

[9] *See* Ross Decl. ¶ 4; Castaldo Tr. at 94:13 to 95:15.

[10] *See* Ross Decl. ¶ 4.

[11] *See* Ross Decl. ¶ 4.

[12] *See* Ross Decl. ¶ 4.

---

outstanding payments allegedly owed under contract as damages.[13] Oxysure has defended that suit and the case remains open.

At a deposition in that suit, Castaldo testified that the money owed by Oxysure was because Castaldo had contacted and sold Oxysure shares to affiliates of his.[14] Indeed, Castaldo did call friends of his, asking Oxysure to send them sample products, and to offer Oxysure's shares at a discount in exempt private offerings.[15] Oxysure complied as a favor to Castaldo—at no time did Oxysure believe—nor agree—that these private placements were substituted for performance under the Agreements nor that they entitled Castaldo to fees.[16] It now appears that was precisely Castaldo's intent the whole time.

Oxysure filed this case seeking declaratory relief to the effect that Defendants' contracts are void, invalid and unenforceable because they violate federal and state

---

[13] *Wall Street Buy Sell Hold, Inc. v. Oxysure Systems, Inc.*, Index No. 603187/2013 (Supreme Court of the State of New York, County of Nassau, 2013.

[14] *See* Castaldo Tr. at 101:24 to 104:22. *See also* Castaldo Tr. at 21:19 to 27:10; *id*. at 28. *See also id*. at 49:14 to 51:8. Castaldo also reveals that he has a "Client Book" where everything that clients buy is recorded. *Id*. at 24:10 to 26:22. *See also id*. at 67:15 to 67:25 ("Q. Would you agree that it's important that people actually follow the recommendations? A. Yes. Q. And that's why you try to follow up with them, with the investors, to find out whether they are following the recommendations, right? A. Any time a report is sent, we call people to discuss that. So, that is our call to action. A report goes out, we call a client. Every time a report is sent, we follow up with a phone call, and obviously an e-mail."). *See also id*. at 98:13-104:32, and i*d*. at 53:11 to 54:8. *See also id*. at 111:8 to 111:15 ("Q. So, let me ask you something. Is it your --if we look through your books, are we going to see that there's people buying -- people buying every single day because of your phone calls? A. I don't know if it's every single day, but probably almost to that effect because that e-mail proves it. Stock traded everyday while we were under contract."). Castaldo Tr. at 55:9 to 17 ("Q. Do you ever call clients and tell them to sell stocks that they may have bought on your recommendation? A. Yes. Q. What would determine when you're going to call a client and tell them to sell? A. Bill Young. When he puts out a sell recommendation, we take profits, we call everyone accordingly."). *See also id*. at 105:5 to 105:14 ("Q. Did you or any of the people that worked for Wall Street Buy Sell Hold call certain clients and tell them -- try to get them to sell OxySure? A. I believe it was not long ago when Julian did some commercials on TV, and the stock had shot up, and there was a liquidity event, so I believe at that point people sold. Q. But were you encouraging people to sell because of liquidity--A. At that point -- at that point we did.").

[15] *See* Ross Decl. ¶ 4.

[16] See Ross Decl. ¶ 4.

securities laws, and seeking restitution of cash and stock payments already made to Castaldo and WSBSH.

## III.

## ARGUMENT AND AUTHORITIES

Plaintiff's Complaint seeks a declaration that Defendants' consulting agreements are unenforceable, restitution of moneys paid, return of stock issued, and attorney's fees.[17] The two contracts under which WSBSH was to provide consulting services are void because neither WSBSH's principal—Castaldo—nor any of its employees, held broker-dealer or similar licensures required under state and federal law.[18]

The description "broker-dealer" is a term of art within the world of securities law, connoting an individual or entity that—due to regular participation in transactions involving tradable investments—must be registered and licensed with various regulatory authorities.[19] Some examples of professionals that typically must hold broker-dealer licensures include: underwriters, investment bankers, market makers, and chartered financial analysts.[20]

---

[17] *See* Original Complaint, Doc. #1.

[18] *Id.* at Ex. A.

[19] *See, e.g., Massachusetts Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976) ("The terms 'broker' and 'dealer' are words of art, with a specific meaning both in the industry and to those members of Congress intimately involved in the drafting of securities legislation.") *aff'd,* 545 F.2d 754 (1st Cir. 1976).

[20] *See generally*, Kathy H. Rocklen and Benjamin J. Catalano, *Broker-Dealer Registration and FINRA Membership*, Published by the Broker-Dealer & Investment Management Regulation Group-Proskauer Rose, LLP (September 2011) (retrieved at: http://www.proskauer.com/files/uploads/broker-dealer/Broker-Dealer-Registration-FINRA-Membership-App.pdf).

Federal laws require broker-dealer registration with national regulatory bodies such as the SEC and FINRA; key federal statutes in this area include the Securities Act of 1933[21] and the Securities Exchange Act of 1934 ("the Exchange Act").[22] Federal law does not completely preempt state regulation of the securities industry, and most states have passed their own laws requiring, *inter alia*, broker-dealer registration with state agencies.[23] State regulations in this field are often referred to as "blue sky" laws.[24]

Here, Defendants were illegally operating as unregistered broker-dealers in violation of the Exchange Act and the Texas Securities Act; that as a result Defendants' consulting agreements are unenforceable; and that payments made thereunder should be rescinded. A firm in Oxysure's position as a defendant in a state court suit to enforce a contract may properly bring a separate case in federal court challenging the validity of those contracts and seeking rescission.[25] This is particularly true where, as here, part of Plaintiff's challenge arises under the Exchange Act, over which the federal courts have exclusive jurisdiction.[26]

---

[21] 15 U.S.C. § 77a *et seq.*

[22] 15 U.S.C.A. § 78a *et seq.*

[23] *See, e.g.*, *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999) ("Although the enactment of [various federal securities laws have] narrowed the role of state blue sky laws by expanding the range of federal preemption, federal and state regulations each continue to play a vital role in eliminating securities fraud and abuse.").

[24] *Id.*

[25] *See Apex Global Partners, Inc. v. Kaye/Bassman Int'l Corp.*, No. 3:09-cv-637, 2009 WL 2777869 (N.D. Tex. Aug. 31, 2009) (overruling motion to dismiss in federal case to invalidate consulting agreements under the Exchange Act that were also the subject of an earlier filed state court suit alleging that *Apex Global*—the federal plaintiff—had breached the agreements and caused damages).

[26] 15 U.S.C. § 78aa ("The district courts of the United States … shall have exclusive jurisdiction of violations of this chapter[.]"). *See also McCormick v. Esposito*, 500 F.2d 620 (5th Cir. 1974); *Apex Global Partners*, 2009 WL 2777869.

**A.    Oxysure's Entitlement to the Requested Relief Under the Exchange Act**

**1.    The Applicable Provisions of the Exchange Act and Elements of Plaintiff's Cause of Action Thereunder**

Section 15(a) of the Exchange Act makes it illegal for an unregistered broker-dealer to effect transactions involving tradable investments, while Section 29(b) provides that "[e]very contract made in violation of [these provisions] … *shall be void*."[27] Courts in the Fifth Circuit have held that Section 29(b) includes an implicit private cause of action that can be raised as a defense to an unregistered broker-dealer's suit to enforce a service contract or in an independent suit, and that either may support rescission.[28] The federal courts have exclusive jurisdiction over suits and defenses arising under the Exchange Act.[29]

To avoid or rescind a contract under the Exchange Act a plaintiff must demonstrate the following elements: (1) it is within the class of persons the Act was intended to protect; (2) it is in a state of contractual privity with the defendant; (3) the defendant was not registered as a broker-dealer; and (4) the defendant violated the Exchange Act by its involvement in one or more "'prohibited transactions'"—*i.e.*, that because of its activities defendant *should* have been registered as a broker-dealer but was not so registered.[30]

---

[27] 15 U.S.C § 78cc(b) (emphasis added).

[28] *Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 557-58 (5th Cir. 1982) ("courts have uniformly … held or assumed that [private] suits [for rescission] can be brought [under §29(b)]"). *See also Pan Am. Life Ins. Co. v. MacInnis*, No. 99-cv-2491, 1999 WL 1220763 at *1 (E.D. La. Dec. 17, 1999).

[29] 15 U.S.C. § 78aa.

[30] *Apex Global Partners*, 2009 WL 2777869 at *3 (quoting *Reg'l Properties*, 678 F.2d at 559) (collecting cases and restating elements of private cause of action under Section 29(b) of the Exchange Act, denying defendant's §12(b)(6) motion to dismiss). *Accord Landegger v. Cohen,* 5 F. Supp. 3d 1278, 1283 (D. Colo. 2013).

A contract is voidable under the Exchange Act if it was "illegal when made *or as in fact performed*,"[31] and the "[plaintiff] need not prove ... scienter to establish a violation."[32]

### 2. The Evidence Shows that Defendants' Consulting Agreements are Void Under the Exchange Act

Courts in this Circuit and others have consistently held that signatories to consulting agreements involving securities are within the class permitted to sue for avoidance and rescission under the Exchange Act.[33] The existence and substance of the contracts between Oxysure and WSBSH is indisputable.[34] And the fact that none of Defendants were licensed as broker-dealers in the applicable time period is like indisputable.[35]

---

[31] *Reg'l Properties*, 678 F.2d at 560 (emphasis added).

[32] *S.E.C. v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (citing *SEC v. National Executive Planners, Ltd.*, 503 F.Supp. 1066, 1073 (M.D.N.C. 1980)).

[33] *See Reg'l Properties*, 678 F.2d at 559 (Section 29(b) permits real estate developers to rescind contract with unregistered consulting specialist hired to assist in raising capital by locating investors to purchase shares in plaintiffs' limited partnership); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) ("It follows that the purchases [defendant] made ... were in violation of § 15(a) of the Exchange Act [and that] ... [plaintiff] may void these transactions [under] section 29(b) of that Act.");

*Apex Global Partners*, 2009 WL 2777869 at 3-4 (overruling unregistered consultant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6); *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n. 6. (2d cir.1998); *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1443–44 n.5 (9th Cir. 1984); *Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.*, 93 F.Supp.2d 220, 233 (D.Conn. 2000) (all allowing rescission claims based on allegations of failing to properly register as a broker-dealer). *Cf. S & D Trading Acad., LLC v. AAFIS Inc.*, 336 F. App'x 443 (5th Cir. 2009) (affirming district court's grant of summary judgment against unregistered securities consulting firm under analogous recisionnary provisions of Texas's blue sky laws).

[34] *See* Original Complaint Doc. #1 at ¶ 20 ("The parties entered into two written agreements ('the Contracts'), herein attached as Exhibit A, whereby Oxysure retained WSBSH to act in a consulting and advisory capacity in order to improve Oxysure's stock price, trading volume, and investor activity.") *with* Answer, Doc.# 21 ¶ 10 ("Defendants admit that the parties entered into two written agreements."). *See also* Castaldo Tr. at p.78-81 and Exhibits 1, 2 and 3 thereto.

[35] *See* Original Complaint Doc.# 1 at ¶16 ("As of March 1998, Castaldo ceased to be registered or associated with any broker-dealer who was registered [under the Exchange Act]."); *see also* Answer Doc.# 21 at ¶ 8 ("Defendants admit the allegations contained in paragraphs 16-18 of the Original Complaint[.]").

Accordingly, the only remaining issue is whether agreements were "illegal when made *or as in fact performed*."[36] Courts have considered a variety of factors on this issue, and when in doubt the Exchange Act "has … been interpreted broadly" to effectuate its remedial purpose.[37] Many courts have observed that "transaction-based compensation [is] one of the hallmarks of being a broker-dealer."[38]

"[A] certain regularity of participation in securities transactions at key points in the chain of distribution" is the *sine qua non* of behavior requiring broker-dealer registration.[39] Here there is no talismanic test, but factors courts typically consider include the defendant's: "(1) history of selling the securities of other issuers; (2) involvement in [giving] advice to investors;"[40] "(3) active[ly] rather than passive[ly] find[ing] investors; (4) involve[ment] in negotiations between the issuer and the investor; (5) mak[ing] valuations as to the merits of the investment or giv[ing] advice;"[41] and (6) negotiating financing from the capital markets.[42]

---

[36] *Reg'l Properties*, 678 F.2d at 560 (emphasis added).

[37] *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006) (citing *Massachusetts Fin. Servs. Inc., v. Securities Investor Prot. Corp.*, 411 F. Supp 411, 415 (D.Mass. 1976), *aff'd* 545 F.2d 754 (1st Cir. 1976)).

[38] *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (internal quotation marks and citation omitted). *Accord DeHuff v. Digital Ally, Inc*., No. 3:08-cv-327, 2009 WL 4908581, at *3 (S.D. Miss. Dec. 11, 2009) ("transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer.").

[39] *Massachusetts Fin. Services, Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D.Mass. 1976) (emphasis added) *aff'd*, 545 F.2d 754 (1st Cir.1976)).

[40] *S.E.C. v. George*, 426 F.3d 786, 797 (6th Cir. 2005) (citing *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr.6, 1984) and *National Executive Planners*, 503 F.Supp. at 1073).

[41] *Martino*, 255 F. Supp. 2d at 283 (quoting *SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413 at *10 (S.D.N.Y. Apr. 6, 1984) (additional citations omitted)).

[42] *Cornhusker Energy Lexington*, 2006 WL 2620985 at *2 (plaintiff's allegations and evidence, interpreted favorably upon defendant's motion for summary judgment, demonstrated that "advisor and consultant" who offered to "identify and introduce sources of capital to provide financing" was

It is axiomatic that in establishing "a certain regularity of participation in securities transactions" on the part of the defendant, an Exchange Act plaintiff may refer to activities beyond its own transaction.[43] Because "broker-dealer registration requirement[s] serve[] as [a] keystone of the entire system of [financial] regulation … designed to protect prospective [counterparties] [by imposing] standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations over [licensees]," a securities consultant cannot compartmentalize its activities across multiple clients or transactions in a hyper-technical fashion to justify operating outside of this regulatory framework.[44] Rather, "the Supreme Court has instructed that [the] requirement[s] [of the Exchange Act] be construed 'flexibly to effectuate its remedial purposes.'"[45]

The evidence shows that Defendants contracted to perform quintessential broker-dealer services without proper registration. Castaldo is operating as a *de facto* broker-dealer because, as he says, "we provide market awareness for publicly traded companies and *we connect good ideas with investors*."[46] Indeed, Castaldo still views himself as a "stock

---

acting as broker-dealer); Apex Global Partners, 2009 WL 2777869 at *3 ("recommending or designing financing methods" triggers broker-dealer registration requirements); *Salamon v. Teleplus Enterprises, Inc.*, No. 05-cv-2058, 2008 WL 2277094 at *8 (D.N.J. June 2, 2008) (same).

[43] *Massachusetts Fin. Services*, 411 F.Supp. at 415 (consultant's "history of selling the securities of other issuers" relevant in establishing violation of broker-dealer registration requirements); *George*, 426 F.3d at 797 (same).

[44] *Roth v. S.E.C.*, 22 F.3d 1108, 1109 (D.C. Cir. 1994). *See also id* ("The interlocking requirements of registration and supervision act to ensure that 'securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells.'" (quoting Persons Deemed Not to Be Brokers, Exchange Act Release No. 20943 (May 9, 1984), 49 Fed.Reg. 20512, 20515 (1984) (brackets in original)).

[45] *S.E.C. v. Goble*, 682 F.3d 934, 945 (11th Cir. 2012) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).

[46] Castaldo Tr. at 7:14 to 7:16 (emphasis added).

picker" and that his job is making recommendations of stocks for his clients to invest in.[47] he's the only one—he "picks all the stocks. [He's] the final say."[48] Castaldo also owns and operates StockTraderPress.com, a subscription-fee investor newsletter service used to market his "expert" advice on stocks to market participants, which is also housed in the same offices as WSBSH.[49]

Castaldo purchases leads from places like Motley Fool—because those leads "listen to him" by which, ultimately, he means they will buy the stocks he sells and become investor clients.[50] He hires independent salespeople who he trains to follow up with these leads and others to discuss the "Recommendations" being made in the newsletters and other communications.[51] The salesmen are paid via *commissions*.[52] And he agrees that the whole purpose of his business is to "get [investors] to invest in a business featured in" one of his newsletters or outreach pieces,[53] and that the newsletter's "whole idea" is to encourage

---

[47] *See* Castaldo Tr. at 35:19 to 35:21 ("Q. Does Wall Street Buy Sell Hold have other researchers? A. No. I pick the stocks on Wall Street."); *see also id*. at 36:19 to 37:12("Q. So the people doing 'analyst things' what do they do? A. They gather information. Q. Information about the companies you're featuring? A. Or recommending, yes." … "Q. What kinds of information are they gathering about the company? A. Pertinent information. Q. Like what? A. Investment -- information that would lead us to make a recommendation, or information that might be pertinent to an investor to put in the newsletter."); *see also id.* at 37:13 to 17 ("Q. How many analysts do you have at Wall Street Buy Sell Hold? A. Just me. Q. You're the only analyst? A. I pick all the stocks. I'm the final say.").

[48] Castaldo Tr. at 37:13 to 17 ("Q. How many analysts do you have at Wall Street Buy Sell Hold? A. Just me. Q. You're the only analyst? A. I pick all the stocks. I'm the final say.").

[49] Castaldo Tr. at 8-10.

[50] *See* Castaldo Tr. at 21:19 to 27:10.

[51] See Castaldo Tr. at 29:8 to 32:12.

[52] See Castaldo Tr. at 43.

[53] Castaldo Tr. at 52:1 to 8.

investors to invest in the companies.[54] Their face-to-face sales meetings with investors is to at least get them to take the newsletter, but sometimes to "get people interested in buying stock."[55]

While Castaldo claims he was helping Oxysure, what he really did was track the stock purchases and sales made by his "salespeople" and used that as a way to gin up more and higher fees.[56] On a weekly basis, WSBSH calls up their clients (the people who get the newsletter) to find out whether they have followed the recommendations.[57] They also recommend to those clients when to sell stocks that they previously recommended the clients should buy—including Oxysure's stock.[58]

---

[54] Castaldo Tr. at 52:9 to 53:8 (…"Q. So, the answer yes, you're encouraging them to invest? A. Yes.").

[55] Castaldo Tr. at 62:3 to 62:23.

[56] *See* Castaldo Tr. at 21:19 to 27:10; *id.* at 28. *See also id.* at 49:14 to 51:8. Castaldo also reveals that he has a "Client Book" where everything that clients buy is recorded. *Id.* at 24:10 to 26:22. *See also id.* at 67:15 to 67:25 ("Q. Would you agree that it's important that people actually follow the recommendations? A. Yes. Q. And that's why you try to follow up with them, with the investors, to find out whether they are following the recommendations, right? A. Any time a report is sent, we call people to discuss that. So, that is our call to action. A report goes out, we call a client. Every time a report is sent, we follow up with a phone call, and obviously an e-mail."). *See also id.* at 98:13-104:32.

[57] *See* Castaldo Tr. at 53:11 to 54:8. *See also id.* at 111:8 to 111:15 ("Q. So, let me ask you something. Is it your --if we look through your books, are we going to see that there's people buying -- people buying every single day because of your phone calls? A. I don't know if it's every single day, but probably almost to that effect because that e-mail proves it. Stock traded everyday while we were under contract.").

[58] *See* Castaldo Tr. at 55:9 to 17 ("Q. Do you ever call clients and tell them to sell stocks that they may have bought on your recommendation? A. Yes. Q. What would determine when you're going to call a client and tell them to sell? A. Bill Young. When he puts out a sell recommendation, we take profits, we call everyone accordingly."). *See also id.* at 105:5 to 105:14 ("Q. Did you or any of the people that worked for Wall Street Buy Sell Hold call certain clients and tell them -- try to get them to sell OxySure? A. I believe it was not long ago when Julian did some commercials on TV, and the stock had shot up, and there was a liquidity event, so I believe at that point people sold. Q. But were you encouraging people to sell because of liquidity--A. At that point -- at that point we did.").

Most importantly, Castaldo wanted to be paid for selling Oxysure stock to the people who bought it directly from Oxysure[59]—the root of his claim is that Oxysure does not "want to pay [Castaldo], but [Oxysure] still does business with [Castaldo's] customers."[60] He admits that "we introduced [Julian Ross] to investors and he agreed to give us additional shares."[61] Castaldo claims that due to their sales, people bought more stock as reflected in Oxysure's stock trades in the market.[62] Such "transaction-based compensation [is] one of the hallmarks of being a broker-dealer."[63]

These facts clearly establish Plaintiff's right to relief under the Exchange Act. Accordingly and for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment finding all contracts here at issue VOID AND UNENFORCEABLE under

---

[59] *See* Ross Decl. at ¶ 4.

[60] Castaldo Tr. at 75:24 to 76:19 (" Q. Can you explain to me – A. And it's just -- it's just aggravating because I still have investors that still deal with Julian [Ross] that still invest in the company, but yet [Julian] say[s] didn't work. ***They don't want to pay me, but they're still doing business with my customers***. I have a problem with that.").

[61] Castaldo Tr. at 80:17 to 80:23. *See also id.* at 86:11 to 87:14.

[62] Castaldo Tr. at 113:1 to 114:6 ("Q. Let's go back to my question because I'm trying to understand this picture that you're wanting to paint with this number. So, you're saying May 24th you stopped calling people, and then immediately -- the stock immediately stopped trading because you stopped calling people? A. Black and white. Q. But that's your claim, right? A. No. That's a fact. Q. But you're taking credit for the stock trading and then you're saying 'because we stopped [calling] the stock stopped trading, right? A. You know what, maybe it's just too coincidental, but I believe that to be true. Q. Now, you also stopped calling people early January after the first contract ended, correct? A. I don't -- I'm sure -- you know, if we're not working, we generally don't call. Q. Right. And you're not -- you're not following up with your subscribers to even though you may have sent them --A. No. Q. -- something about OxySure, you're not following up with them to encourage them to buy because you're not getting paid anymore; is that fair? A. We still have to update people on OxySure today, even though we might not encourage the investment, but we still have people who hold it and we still have to, unfortunately, follow the stock because people are still invested into it.").

[63] *S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (internal quotation marks and citation omitted). *Accord DeHuff v. Digital Ally, Inc.*, No. 3:08-cv-327, 2009 WL 4908581, at *3 (S.D. Miss. Dec. 11, 2009) ("transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer.").

the Exchange Act, and ordering that Defendants may not seek to enforce said contracts or claims for money.

## B. <u>Oxysure is Entitled to Restitution of Cash and Stock Already Paid</u>

The previous section demonstrated that the contracts are void under the Exchange Act. Plaintiff's entitlement to rescission, *i.e.*, recovery of remuneration already paid, is a related but separate issue.[64] "The Fifth Circuit … [has] set out a balancing test to determine when a court may allow for restitution [which considers]:

> [T]he extent of the enrichment and the degree of unjustness wrought by its retention weighed against the policy against enforcement, the extent of the non-violator's participation, and whether a judgment depriving the violator of the benefits received will subvert the policy underlying the rule of law that makes the transaction illegal."[65]

Stated somewhat differently, "a plaintiff bringing a section 29(b) claim may be entitled to 'restitution in the amount he can prove [the defendant] to have been unjustly enriched.'"[66]

But here, the evidence (or lack thereof) establishes that "[Defendants] generally did not perform [their] obligations under the Contracts," and actually "acknowledged [their] inadequate performance."[67] Indeed, consistent with Castaldo's Wolf of Wall Street history, Defendants *always* "intended to over-promise and under-deliver" in an artifice to extract undeserved payments from Oxysure. [68]

---

[64] *See Regional Props.*, 678 F.2d at 564 ("The fact that public policy embodied in the securities laws prohibits enforcement of the contract is not alone a sufficient reason to allow even an innocent party to retain an unjust enrichment at the expense of a culpable one.").

[65] *Energytec, Inc. v. Proctor*, 516 F. Supp. 2d 660, 675 (N.D. Tex. 2007) (quoting *Regional Props.*, 678 F.2d at 564-65).

[66] *Id.* (quoting *Prudential–Bache Secs., Inc. v. Cullather*, 678 F.Supp. 601, 607 (E.D.Va.1987)) (brackets in original).

[67] *See* Doc.# 1.

[68] Castaldo Tr. at Exhibit 7.

Unlike *Regional Properties* where defendants "*had* done the work promised," here the *opposite* is conclusively established,[69] and Oxysure is entitled to rescission under the Exchange Act.[70] Indeed, if this was not enough, the fact that Castaldo "h[eld] himself out as an upstanding member in the world of investable securities" while materially omitting "the numerous criminal, civil, and administrative cases in which he had been a defendant for securities fraud and other forms of securities-related misconduct,"[71] further establishes that rescission is the equitable result here.[72]

Here, Castaldo admitted that he had been paid $36,500 and $95,000 shares of Oxysure common stock.[73] Accordingly and for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment awarding RESCISSION of all cash and shares paid over to Defendants plus prejudgment interest.

### C. Oxysure is Entitled to Relief Under the Texas Securities Act

The Texas Securities Act ("the TSA") is this state's primary blue sky law; it parallels some requirements under the Exchange Act, although it is generally regarded as broader than its federal counterpart.[74] The TSA merges the broker-dealer construct into a single entity, referring to both as "dealers."[75] Anyone who sells or offers for sale securities,

---

[69] 678 F.2d at 564 (emphasis added).

[70] *See id.*

[71] Doc. #1 at ¶19.

[72] *See Regional Props.*, 678 F.2d at 564 (explaining additional equitable factors considered in awarding rescission).

[73] Castaldo Tr. at p. 90-92, and *see* Exhibits 1 (see Exhibit D thereto) and Exhibit 9.

[74] *See Reed v. Prudential Sec. Inc.,* 875 F. Supp. 1285, 1292 (S.D. Tex. 1995) ("the Texas Securities Act is arguably broader than [similar federal securities laws]") *aff'd,* 87 F.3d 1311 (5th Cir. 1996) .

[75] *See* Tex.Rev.Civ. Stat. Ann. § art. 581-4(H) (Vernon Supp. 2005) ("'Broker' shall mean dealer as herein defined.").

or solicits orders for offers for sales of securities, or even *invites* offers for sales of securities is a "dealer;" and if that were not enough, the TSA also includes a catch-all phrase that brings under its ambit "every person or company who deals in any other manner in any security or securities within this state."[76] The TSA prohibits dealers from conducting business without first registering with state regulators, and renders void and unenforceable any contract entered into by an unregistered dealer.[77]

As discussed above, the evidence is more than sufficient to prove a claim for declaratory relief under the TSA. Given that WSBSH—an entity which, like Castaldo, is not registered under the law—claimed that it would (and in fact did) locate "big" investors in Texas,[78] and actually appropriated shares of Oxysure stock by misrepresenting its qualifications and capacities as a securities consultant, Plaintiff is entitled to a declaration that Defendants "may [not] base any suit on the contract[s]."[79]

Moreover, Plaintiff is entitled to rescission of all shares paid over to WSBSH under the consulting agreements. The TSA provides that "[a] person who offers to buy or buys a security … by means of an untrue statement of a material fact or an omission of a material fact … is liable to the person selling the security to him, who may sue either at law or in equity for rescission or damages if the buyer no longer owns the security."[80]

Defendants material omissions regarding Castaldo's status as a disgraced purveyor of broker-dealer services and who had been subjected to numerous criminal, civil, and

---

[76] *See id.*

[77] *See* Tex.Rev.Civ. Stat. Ann. § art. 581-33(K).

[78] See Ross Decl. at ¶ 3.

[79] Tex.Rev.Civ. Stat. Ann. art. 581-33(K) (Vernon Supp. 2005).

[80] Tex.Rev.Civ. Stat. Ann. art. 581-33(B) (Vernon Supp. 2005).

administrative actions, and material misstatements regarding the quality and amount of work that would be done in exchange for the shares received under the consulting agreements.[81] In the posture of this case, Oxysure is entitled to all relief requested in the Complaint under the TSA, including a declaration that the consulting agreements are void and rescission of shares already paid over.[82]

Accordingly and for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment finding all contracts here at issue VOID AND UNENFORCEABLE under the Texas Securities Act, holding that Defendants TAKE NOTHING in any suit to enforce said contracts, and awarding RESCISSION of all money and shares paid over to Defendants.

### D. Oxysure is Entitled to Attorney's Fees

The Complaint also seeks Oxysure's reasonable attorney's fees. Under Texas law "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs" where its claim arises out of "an oral or written contract."[83] Plaintiff has established a valid claim arising out of Defendants' written contracts and oral statements regarding same.

Accordingly and for the foregoing reasons, Plaintiff respectfully requests that this Court enter a judgment AWARDING REASONABLE ATTORNEY'S FEES pursuant to Tex. Civ. Prac. & Rem. Code § 38.001(8), in an amount to be demonstrated by submission

---

[81] Ross Decl. ¶¶ 3 to 4. *See also* Section III(B), *supra*, (discussing Exchange Act rescission).

[82] *See Lane Hartman Ltd. v. P.R.O. Missions, Inc.*, No. 3:95-cv-0869, 1997 WL 457512 at *9 (N.D. Tex. Aug. 5, 1997) ("Defendants are entitled to rescission of the Agreements [under the TSA].").

[83] Tex. Civ. Prac. & Rem. Code § 38.001(8) (Vernon 2008).

of counsel's hours, documentation of which may be shown to the extent the Court deems necessary at a Rule 55(b)(2) prove-up hearing.

## IV.

## CONCLUSION

Plaintiff respectfully requests that the Court enter JUDGEMENT in its favor, awarding all relief sought in its Complaint, as described in greater detail above.

Respectfully submitted this 15th day of February, 2016.

                                        **STECKLER LLP**

                                      */s Mazin A. Sbaiti*
                                      Mazin A. Sbaiti, Esq.
                                      State Bar No. 24058096
                                      12720 Hillcrest Rd., Suite 1045
                                      Dallas, Texas 75230
                                      T: (972) 387-4040
                                      F: (972) 387-4041
                                      Mazin@Stecklerlaw.com
                                      ***Counsel for the Plaintiff***

## **CERTIFICATE OF SERVICE**

      This is to certify that on the 15th day of February, 2016, a true and correct copy of the above and foregoing instrument was served via electronic service and/or First Class mail, upon the following counsel of record in accordance with the Texas Rules of Civil Procedure:

      Scott Smith
      120 South Crockett Street
      P.O. Box 354
      Sherman, TX 75091-0354
      Email: smithlaw@airmail.net
      Fax: 903-870-1446

                                                */s Mazin A. Sbaiti*
                                                Mazin A. Sbaiti, Esq.